IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**FILED**

JUL 22 2011

MICHAEL E KUNZ, Clerk
By_____Dep. Clerk

| | | |
|---|---|---|
| LOIS JEAN CONNER, et al., | : | CONSOLIDATED UNDER |
| | : | MDL 875 |
|     Plaintiffs, | : | |
| | : | CIVIL ACTION |
| | : | NO. 09-67099 X |
|   v. . | : | |
| | : | Transferred from the Central |
| | : | District of California |
| ALFA LAVAL, INC., et al., | : | (Case No. 09-02317) |
| | : | |
|     Defendants. | : | |

| | | |
|---|---|---|
| JAMES H. PRANGE, et al., | : | CONSOLIDATED UNDER |
| | : | MDL 875 |
|     Plaintiffs, | : | |
| | : | CIVIL ACTION |
| | : | NO. 09-91848 X |
|   v. | : | |
| | : | Transferred from the Central |
| | : | District of California |
| ALFA LAVAL, INC., et al., | : | (Case No. 09-06698) |
| | : | |
|     Defendants. | : | |

| | | |
|---|---|---|
| JAMES W. STONE, et al., | : | CONSOLIDATED UNDER |
| | : | MDL 875 |
|     Plaintiffs, | : | |
| | : | CIVIL ACTION |
| | : | NO. 09-93726 - File |
|   v. | : | |
| | : | Transferred from the Northern |
| | : | District of California |
| ALFA LAVAL, INC., et al., | : | (Case No. 09-02327) |
| | : | |
|     Defendants. | : | |

| | | |
|---|---|---|
| TINA M. WILLIS, | : | CONSOLIDATED UNDER |
| | : | MDL 875 |
|     Plaintiff, | : | |
| | : | CIVIL ACTION |
| | : | NO. 09-91449 X |
|   v. | : | |
| | : | Transferred from the District |

```
                              :    of South Carolina
BW IP INTERNATIONAL, INC.,    :    (Case No. 09-02163)
et al.,                       :
                              :
      Defendants.             :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    JULY 21, 2011

I.    INTRODUCTION...............................................2
II.   BACKGROUND.................................................5
      A.    Conner v. Alfa Laval, Inc...........................5
      B.    Prange v. Alfa Laval, Inc...........................6
      C.    Stone v. Alfa Laval, Inc............................7
      D.    Willis v. BW IP International, Inc...................8
III.  DISCUSSION.................................................8
      A.    Legal Standard for Determining Whether Maritime Law
            Applies............................................10
            1.    Historical Development.......................10
            2.    Modern Standard..............................14
      B.    Caselaw Treatment in the Asbestos Context..........16
            1.    Pre-Sisson/Grubart Cases.....................16
            2.    Post-Sisson/Grubart Cases....................19
      C.    Application........................................22
            1.    Locality Test................................22
            2.    Connection Test..............................24
                  a.    Potentially disruptive impact on maritime
                        commerce...............................24
                  b.    Substantial relationship to traditional
                        maritime activity......................29
IV.   CONCLUSION...............................................30

I.    **INTRODUCTION**

        Plaintiffs Lois Jean Conner, Jane Prange, James W.

Stone, and Tina M. Willis ("Plaintiffs"), whose respective cases

have been consolidated as part of the MDL-875 litigation, bring

these asbestos products liability cases against several

2

defendants.  Plaintiffs' complaints all plead asbestos-related injuries stemming from exposure to asbestos-containing products during service with the United States Navy ("Navy").  Like many of the cases pending in this Court's MDL-875 docket arising from such exposure, the allegations concerning where and how the injuries were sustained are varied; some of the plaintiffs allege exposure whilst aboard Navy ships at sea while others emphasize exposure stemming from work in Navy shipyards.

The defendants, citing a number of bases for disposing of Plaintiffs' cases without trial, urge that summary judgment should be granted in their favor.[1]  Plaintiffs disagree.  Central

---

[1]     While not named as defendants in all of the cases considered in this memorandum, the following parties each seek summary judgment in at least one of the four cases discussed: General Electric Company (Conner, Prange), IMO Industries, Inc. (Prange), Buffalo Pumps, Inc. (Prange), Trane US, Inc. (Prange), Armstrong International, Inc. (Stone), Foster Wheeler Energy Corporation (Prange, Stone, Willis), Warren Pumps LLC (Prange, Stone), Crane Company (Prange, Stone, Willis), CBS Corporation f/k/a Westinghouse Electric Corporation (Stone, Willis), and Ingersoll-Rand Company (Willis).  Each of these ten defendants is alleged to have manufactured defective products that caused asbestos-related disease.  Specifically, General Electric Company is alleged to have manufactured defective turbines; IMO Industries, Inc. is alleged to have manufactured defective turbines, purifiers, and generators; Buffalo Pumps, Inc. is alleged to have manufactured defective pumps; Trane US, Inc. is alleged to have manufactured defective boilers; Armstrong International, Inc. is alleged to have manufactured defective steam traps; Foster Wheeler Energy Corporation is alleged to have manufactured defective boilers; Warren Pumps LLC is alleged to have manufactured defective pumps; Crane Company is alleged to have manufactured defective valves, packing, and gaskets; CBS Corporation is alleged to have manufactured defective turbines; and Ingersoll-Rand Company is alleged to have manufactured defective pumps.

to disposition of the pending motions is another issue that the parties vigorously dispute:  what law applies in the first instance.  The defendants ask the Court to apply maritime law in resolving the pending motions while Plaintiffs contend that maritime law is inapplicable.[2]  Given the complexity and importance of the maritime law question to these and other cases in MDL-875, the Court will address it first in this memorandum, leaving the resolution of the other issues raised in the summary judgment motions to be addressed separately under the rubric outlined herein.[3]

As set forth below, the Court concludes that the maritime jurisdiction test requires the Court to apply maritime law to those claims involving plaintiffs who were sea-based Navy workers where the allegedly defective product was produced for use on a vessel.[4]  By contrast, maritime law does not govern when

---

[2]     At a hearing on the motions for summary judgment in these cases, the parties presented argument concerning whether maritime law controls these disputes.  Following the hearing, the Court permitted the parties to submit supplemental legal memoranda addressing the applicability of maritime law.  All but two of the defendants in these cases, Trane U.S., Inc. and Ingersoll-Rand Company, filed supplemental legal memoranda with the Court.

[3]     The Court has previously dealt with this issue, albeit in more cursory fashion.  See, e.g., Ferguson v. Lorillard Tobacco Co., No. 09-91161, doc. no. 238 (E.D. Pa. Mar. 2, 2011); Delatte v. A.W. Chesterton Co., No. 09-69578, doc. no. 244 (E.D. Pa. Feb. 28, 2011).

[4]     The words "maritime" and "admiralty" are used interchangeably in the caselaw.  See, e.g., Sisson v. Ruby, 497

the asbestos claims asserted stem from predominantly land-based Navy work even if the allegedly defective product was produced for use on a vessel. Applying this standard, the Court finds that maritime law governs the disputes in <u>Conner</u>, <u>Prange</u>, and <u>Stone</u> inasmuch as the injured parties in those cases were Navy sailors who spent the bulk of their time sailing on navigable waters. Because the injured party in <u>Willis</u> was a land-based Navy shipyard worker, the Court finds that maritime law does not apply and that <u>Willis</u> is therefore subject to resolution under state law.

Thus, the motions for summary judgment in <u>Conner</u>, <u>Prange</u> and <u>Stone</u> will be granted to the extent that they seek a ruling that maritime law applies while the motions for summary judgment seeking such a ruling in <u>Willis</u> will be denied.[5]

## II.  BACKGROUND

### A.  <u>Conner v. Alfa Laval, Inc.</u>

Plaintiff Jean Conner brings her action as successor-

---

U.S. 358, 362 (1990) (equivocating between "maritime jurisdiction" and "admiralty jurisdiction"). For consistency, this memorandum uses the terms "maritime jurisdiction" and "maritime law" as opposed to "admiralty jurisdiction" and "admiralty law."

[5]    The Court rules in these matters via partial summary judgment because the maritime law issue was raised in the context of the pending summary judgment motions. Under different circumstances, this question may be subject to resolution via Federal Rule of Evidence 104 or a ruling on a motion <u>in limine</u>.

in-interest to Robert Conner, who passed away after contracting
mesothelioma.  Conner alleges that Mr. Conner's mesothelioma was
caused by exposure to asbestos while serving as a machinist's
mate aboard various Navy ships from 1962 to 1971.  (Pl.'s Resp.
in Opp. to Def.'s Mot. for Summ. J., doc. no. 188, at 2.)   In
particular, it is Conner's position that Mr. Conner was exposed
to asbestos aboard the USS Yorktown where he worked in the engine
room, the auxiliary room, and the fire room.  (See Def.'s Mot.
for Summ. J., doc. no. 168, Ex. B, at 18-20.)  In this capacity,
Mr. Conner "maintain[ed] the equipment," "repair[ed] pumps,"
"remove[d] any gaskets that needed to be removed and replaced"
and "fix[ed] . . . any valves that were leaking from the valve
stems."  (Id. at 19.)  During Mr. Conner's service aboard the USS
Yorktown, the ship routinely sailed international waters before
returning to dock in the Subic Bay in the Philippines.  (Id. at
29-30.)


B.    Prange v. Alfa Laval, Inc.

Plaintiff Jane Prange alleges that James H. Prange
contracted mesothelioma, and died, as a result of exposure to
asbestos while serving in the Navy from 1965 to 1969.  From 1965
to 1968, Mr. Prange served aboard the USS Pollux, which sailed
international waters and transported items to other vessels at
sea.  (See Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., doc.

6

no. 212, Ex. A, at 33-34.)  Whilst aboard the USS Pollux, Mr.
Prange served in the fire room, where he was responsible for
cleaning and maintaining the boilers in addition to the machinery
associated with running the boiler aboard the ship.  (See id. at
43-44.)  After serving on the USS Pollux, Mr. Prange spent one
year aboard the USS Delta as a boiler tender.  (See id. at 37.)
The USS Delta sailed between various ports, during which time Mr.
Prange would board and conduct repairs of other vessels' boilers
and associated equipment.  (See id.)

### C.   Stone v. Alfa Laval, Inc.

        Plaintiffs James and Elsie Stone allege that Mr.
Stone's mesothelioma was caused by exposure to asbestos-
containing products when he served as a Navy boiler tender from
1959 to 1976.  (See Pl.'s Resp. in Opp. to Def.'s Mot. for Summ.
J., doc. no. 217, at 3.)  Mr. Stone served aboard the USS Boxer
and the USS Casa Grande.  During his period of active Navy
service on the USS Boxer, Mr. Stone was responsible for
"maintaining the main propulsion generators and associated
equipment located in the machinery spaces of the ship."  (Id.)
In addition, Mr. Stone "worked on the piping, valves and pumps,
turbines, and reduction gear associated with th[e] generators."
(Id. at 4.)

D.   Willis v. BW IP International, Inc.

Plaintiff Tina Willis, individually and as representative of Hiram Peavy's estate, seeks redress for Peavy's ultimately fatal mesothelioma.  Willis alleges that Peavy's mesothelioma was caused by his exposure to asbestos-containing products whilst working as a shipyard worker at the Charleston Naval Shipyard.  (See Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., doc. no. 73, at 2-3, 29.)  Peavy principally served as a machinist, performing land-based repairs to Navy equipment. (Id. at 2-3.)  He also performed overhauls, and reinstalled equipment on Navy ships.  (Id.)

**III. DISCUSSION**

Reasoning that maritime law applies when the Court has maritime jurisdiction, see E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law."); Gibbs ex rel. Gibbs v. Carnival Cruise Lines, 314 F.3d 125, 132 (3d Cir. 2002) ("Since we conclude that this case sounds in admiralty, we apply federal admiralty law . . . ."), the defendants urge that maritime jurisdiction exists and ask the Court to apply maritime law to the disputes because the alleged asbestos exposure occurred when Plaintiffs were working on or around Navy ships.  Plaintiffs, on the other hand, contend that

maritime law does not apply in these cases because (1) the alleged injuries occurred on Navy ships, which are not within the purview of the Court's maritime jurisdiction; and (2) the work performed and the injuries sustained are not unique to maritime commerce or navigation.

This threshold dispute is a question of federal law, see U.S. Const. art. III, § 2; 28 U.S.C. § 1333(1), that is therefore governed by the law of the circuit in which the MDL court sits, see In re Asbestos Prods. Liab. Litig. (Oil Field Cases), 673 F. Supp. 2d 358, 362 (E.D. Pa. 2009) (Robreno, J.). And it is an important one requiring cognizance of the balance between state and federal authority, because the applicability of maritime jurisdiction results in federal maritime law displacing state law.[6] See Transamerica Delaval, Inc., 476 U.S. at 864; Gibbs, 314 F.3d at 132. Paying due heed to the federalism considerations lurking beneath the surface of the maritime jurisdiction inquiry,[7] the Court turns to survey comprehensively

---

[6]     That is not to say, of course, that maritime law necessarily differs from state law in every case.  In fact, in some respects, maritime law incorporates state law.  See Transamerica Delaval, Inc., 476 U.S. at 864-65 ("Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." (internal footnote omitted)).

[7]     The potential displacement of state law is not the only source of tension between state and federal authority in this area of law; the question of which forum should hear a maritime dispute has also required careful judicial treatment over the years.  See, e.g., Eduardo C. Robreno, Learning to do Justice:

the development of maritime jurisdiction to determine whether it exists in these cases and, by extension, whether maritime law governs the parties' disputes.

### A.    Legal Standard for Determining Whether Maritime Law Applies

The United States Constitution confers federal courts with the authority to hear "all Cases of admiralty and maritime Jurisdiction."  U.S. Const. art. III, § 2.  "Congress has embodied that power in a statute," Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 531 (1995), affording district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled," 28 U.S.C. § 1333(1).

### 1.    Historical Development

Historically, determining whether maritime jurisdiction existed in a tort case turned on a bright line locality test under which the only relevant question was the locus of the tort.

_____

An Essay on the Development of the Lower Federal Courts in the Early Years of the Republic, 29 Rutgers L.J. 555, 565 (1998) (explaining that the constitutional grant of maritime jurisdiction to the federal courts created questions of "line drawing, as to which cases could be brought in which courts," that "tested the harmony of federal-state relations and required the expenditure of a good deal of judicial energy for many years").

10

If the tort occurred on navigable waters, "admiralty jurisdiction followed; if it did not, admiralty jurisdiction did not exist." Grubart, 513 U.S. at 531-32; see The Plymouth, 70 U.S. 20, 36 (1865) ("The jurisdiction of the admiralty does not depend upon the fact that the injury was inflicted by the vessel, but upon the locality—the high seas, or navigable waters where it occurred."). Recognizing the limitations of this approach, the Supreme Court abandoned this paradigm in Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249 (1972).

Indeed, noting the number of conceivable "cases where the maritime locality of the tort is clear, but where the invocation of admiralty jurisdiction seems almost absurd," the Court instructed that "reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law." Id. at 255, 261. Applying this methodology to the facts presented in that case—an aviation accident in which a plane crashed into navigable waters after striking a flock of seagulls—the Court deemed maritime jurisdiction inappropriate because the claims at issue were "only fortuitously and incidentally connected to navigable waters" with "no relationship to traditional maritime activity." Id. at 273.

Despite Executive Jet's broad admonishment of strict adherence to the locality test, its facts left open the question of whether courts should look beyond locality outside the

11

aviation context.  The Supreme Court resolved this issue in

Foremost Insurance Company v. Richardson, 457 U.S. 668 (1982),

unequivocally clarifying that "the Executive Jet requirement that

the wrong have a significant connection with traditional maritime

activity is not limited to the aviation context."  Id. at 674.

In doing so, the Court also expanded on Executive Jet's

requirement that the wrong have a relationship to traditional

maritime activity.  Rejecting the petitioners' argument that a

substantial relationship with commercial maritime activity was

necessary for maritime jurisdiction to attach, the Court

explained that:

> The federal interest in protecting maritime commerce
> cannot be adequately served if admiralty jurisdiction is
> restricted to those individuals actually engaged in
> commercial maritime activity.  This interest can be fully
> vindicated only if all operators of vessels on navigable
> waters are subject to uniform rules of conduct.  The
> failure to recognize the breadth of this federal interest
> ignores the potential effect of noncommercial maritime
> activity on maritime commerce.

Id. at 674-75.  Thus, although the accident at issue merely

involved a collision between two noncommercial vessels, the Court

held that the requisite relationship was present and that

maritime jurisdiction applied.  See id. at 675-77.

Expanding on the principle that potential to disrupt

maritime commerce is integral to the maritime jurisdiction

calculus, the Court laid the foundation for the modern maritime

jurisdiction test in Sisson v. Ruby, 497 U.S. 358 (1990).  In

Sisson, a fire erupted on a pleasure yacht docked in a navigable waterway. Id. at 360. In addition to the requirement of a maritime locality, the Court explained that determining whether maritime jurisdiction applies requires analysis of two questions pertinent to the accident's maritime nexus: (1) the incident's potential effect on maritime commerce; and (2) the relationship between the activity giving rise to the incident and traditional maritime activity. See id. at 362, 367.

The Court instructed that the first of these two inquiries is resolved by reference to "the potential impact of a given type of incident by examining its general character." Id. at 363. Similarly, the Court stated that the "activity" at issue should be defined generally for the purpose of determining whether there is a sufficient relationship between the activity giving rise to the incident and traditional maritime activity. See id. at 365. And, viewing the facts presented under this methodology, the Court concluded that maritime jurisdiction applied even though the vessel on which the fire started was not engaged in navigation and no commercial vessels had been docked at the marina.

First, the Court concluded that a fire on a vessel "at a marina located on a navigable waterway . . . has a potentially disruptive impact on maritime commerce." Id. at 363. Second, defining the activity in that case as "the storage and

13

maintenance of a vessel at a marina on navigable waters," _id._ at

365, the Court concluded the requisite substantial connection to

traditional maritime activity was also present because "the need

for uniform rules of maritime conduct and liability is not

limited to navigation, but extends at least to other activities

traditionally undertaken by vessels, commercial or

noncommercial," _id._ at 367.


### 2.   Modern Standard

The Court most recently articulated the jurisdictional

standard in <u>Grubart</u>, a case in which maritime jurisdiction was

contested after water from the Chicago River flooded the basement

of several buildings when a crane on a barge was used to drive

new pilings into a riverbed.  513 U.S. at 530.  While

acknowledging that <u>Sisson</u>'s standard controlled in instances

"where all the relevant entities are engaged in similar types of

activity," the <u>Grubart</u> petitioners opposed application of the

<u>Sisson</u> test because "most of the victims, and one of the

tortfeasors, [were] based on land."  <u>Id.</u> at 544.

Under these circumstances, the petitioners asked the

Court to adopt a standard more readily limiting the application

of federal jurisdiction, pointing to a test utilized by the Fifth

Circuit that determined the applicability of maritime

jurisdiction by "looking to 'the functions and roles of the

14

parties; the types of vehicles and instrumentalities involved;
the causation and the type of injury; and traditional concepts of
the role of admiralty law.'"  Id. (quoting Kelly v. Smith, 485
F.2d 520, 525 (5th Cir. 1973)).  The Court recognized that the
concerns espoused in support of a new standard were valid ones.
See id.  However, it emphasized that "the Sisson tests are aimed
at the same objectives invoked to support [the] new multifactor
test," and concluded that the standard set forth in Sisson
adequately furthered those ends, id. at 545-46.

       Thus, in the wake of Grubart, it is clear that "a party
seeking to invoke federal admiralty jurisdiction pursuant to 28
U.S.C. § 1333(1) over a tort claim must satisfy conditions both
of location and of connection with maritime activity."  Id. at
534.  The locality test requires that the tort occur on navigable
waters or, for injuries suffered on land, that the injury be
caused by a vessel on navigable waters.  See id.  The connection
test, by contrast, contains the abovementioned two components
described in Sisson:

> A court, first, must 'assess the general features of the
> type of incident involved,' to determine whether the
> incident has 'a potentially disruptive impact on maritime
> commerce.'  Second, a court must determine whether 'the
> general character' of the 'activity giving rise to the
> incident' shows a 'substantial relationship to
> traditional maritime activity.'

Id. (internal citations omitted) (quoting Sisson, 497 U.S. at
363, 364 n.2, 365).  The second prong of this connection test, as

15

the Grubart court clarified, requires courts to focus on the
tortfeasor's conduct because maritime jurisdiction is only proper
if the tortfeasor's actions relate to maritime activity.[8]  See
id. at 539-40 ("In the second Sisson enquiry, we . . . ask
whether a tortfeasor's activity . . . is so closely related to
activity traditionally subject to admiralty law that the reasons
for applying special admiralty rules would apply in the suit at
hand.").


    B.    Caselaw Treatment in the Asbestos Context

        1.    Pre-Sisson/Grubart Cases

            Before Sisson and Grubart were decided, however,
several courts considered whether maritime jurisdiction applies
to asbestos-related injury claims arising from work on or around
ships.  As in the cases at issue here and scattered across the
Court's MDL-875 docket, the manner in which the alleged exposure
occurred differed.  Some cases involved asbestos exposure that
largely occurred on land or aboard docked ships.  See Eagle-

---

        [8]    The Grubart court explained, however, that the
necessary relationship is satisfied as to permit maritime
jurisdiction provided "at least one alleged tortfeasor was
engaging in activity substantially related to traditional
maritime activity and such activity is claimed to have been a
proximate cause of the incident."  Grubart, 513 U.S. at 541.  And
once maritime jurisdiction is appropriate as to a claim against a
particular party, jurisdiction over other defendants against whom
maritime jurisdiction could not be asserted would be proper under
principles of supplemental jurisdiction.  See id. at 548
(O'Connor, J., concurring).

Picher Indus., Inc, v. United States, 846 F.2d 888, 891 (3d Cir.
1988) (exposure to asbestos-based insulation products during
service as a sheetmetal worker at the Philadelphia Naval
Shipyard); Oman v. Johns-Manville Corp., 764 F.2d 224, 226 (4th
Cir. 1985) (exposure during work as "land-based shipyard workers
for Newport News Shipbuilding and Drydock Company"); Harville v.
Johns-Manville Prods. Corp., 731 F.2d 775, 777 (11th Cir. 1984)
(exposure to plaintiffs who served as "insulators, pipe-fitters,
welders, boilermakers, machinists, foreman, and general laborers
in the construction and repair of vessels"). In other cases, at
least a portion of the alleged asbestos exposure occurred at sea
on navigable waters. See Cochran v. E.I. duPont de Nemours, 933
F.2d 1533, 1535 (11th Cir. 1991) (exposure for a Navy sailor
during active Navy service on an aircraft carrier); Petersen v.
Chesapeake & Ohio Ry. Co., 784 F.2d 732, 734 (6th Cir. 1986)
(exposure while serving as a machinist repairing equipment and
machinery on car ferries "sailing between ports on the Great
Lakes"); Myhran v. Johns-Manville Corp., 741 F.2d 1119, 1120 (9th
Cir. 1984) (asbestos exposure "occurred while [the plaintiff] was
employed as a pipefitter engaged in the repair and renovation of
vessels on navigable waters").

　　　　Although the courts confronted with these fact patterns
generally accepted that the locality test was satisfied, see,
e.g., Eagle-Picher, 846 F.2d at 896 (noting that "a shipyard

17

worker's claim based on an asbestos-related injury" will "normally satisf[y] the threshold 'situs' test for admiralty jurisdiction"),[9] they determined that application of maritime law was improper on the ground that the asbestos products liability claims asserted did not bear a sufficient connection to traditional maritime activity, see Cochran, 933 F.2d at 1538-39; Eagle-Picher, 846 F.2d at 896-97; Petersen, 784 F.2d at 736; Oman, 764 F.2d at 230-32; Myhran, 741 F.2d at 1122-23; Harville, 731 F.2d at 783-85; see also Woessner v. Johns-Manville Sales Corp., 757 F.2d 634, 643-49 (5th Cir. 1985).

Notably, however, these decisions were made under the Kelly framework (or a variant thereof) that the Grubart court expressly disavowed.[10]  And because the courts' analyses hinged on "the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law," Kelly, 485 F.2d at 525, the key reason for rejecting maritime

---

[9]    See also Oman, 764 F.2d at 228 (finding the locality test satisfied for primarily land-based shipyard workers); Harville, 731 F.2d at 782 ("[A] plaintiff's claims have met the jurisdictional location requirement if the plaintiff has been exposed to asbestos on navigable waters regardless of whether he has also suffered exposures on land.").

[10]    As noted in Part III.A, Grubart confirmed the vitality of the test the Court endorsed in Sisson and rejected the Fifth Circuit's Kelly test.  However, although Sisson was decided in 1990, the Eleventh Circuit's 1991 decision in Cochran did not cite Sisson or apply its factors.

jurisdiction was invariably the fact that "the tasks performed
and the injuries incurred by the involved workers were identical
to those of asbestos workers who ha[d] never stepped aboard a
vessel," Petersen, 784 F.2d at 736.


    2.   Post-Sisson/Grubart Cases

       Of course, the fact that the work performed and the
injuries sustained in sea-based asbestos exposure cases may be
identical to those pertaining to purely land-based work is less
significant under the now-governing Sisson/Grubart test.  Sisson
and Grubart, after all, instruct that resolution of the maritime
connection test simply requires inquiry into "whether the
incident has a potentially disruptive impact on maritime
commerce" and whether the tortious acts leading to the injury
demonstrate a "substantial relationship to traditional maritime
activity."  Grubart, 513 U.S. at 534 (internal marks omitted)
(quoting Sisson, 497 U.S. at 364 n.2, 365).  While this
methodology is designed to weed out cases for which "the
rationale for [maritime] jurisdiction does not support it," id.
at 544-45, its application does not result in finding maritime
jurisdiction inappropriate simply because the tasks performed and
injuries sustained are identical to those "of asbestos workers
who ha[d] never stepped aboard a vessel," Petersen, 784 F.2d at
736.  The post-Sisson/Grubart cases reflect as much.

In <u>Lambert v. Babcock & Wilcox, Co.</u>, 70 F. Supp. 2d 877 (S.D. Ind. 1999), for example, the court determined that maritime law governed a dispute in which a former Navy sailor was exposed to asbestos aboard a Navy vessel. <u>See id.</u> at 886. Rejecting the logic and reasoning advanced in the cases described in Part III.B.1, the <u>Lambert</u> court found that the connection test was satisfied. <u>See id.</u> at 884. Indeed, with respect to the first prong of the <u>Sisson/Grubart</u> connection test, the court explained that:

> The incident in the case at bar—asbestos exposure in the boiler room of a ship—could potentially disrupt maritime commerce by rendering the boiler room too hazardous to operate. Unsafe working conditions aboard a vessel have consistently been held to pose a potentially disruptive impact upon maritime commerce, and this case is no exception. The operation of the boiler room is a necessary function of a vessel and its shut down would certainly disrupt the ship's operation. Moreover, asbestos-related illness could afflict other members of the crew, causing a labor shortage. Such a shortage could be exacerbated by fear of exposure by crew members and potential crew members alike.

<u>Id.</u> (internal citations omitted). And, framing the relevant activity that occurred as the "maintenance and operation of a ship's boiler room," the court concluded that the second prong of <u>Sisson/Grubart</u>'s connection test was satisfied because such action is "clearly . . . substantially related to traditional maritime activity." <u>Id.</u>

Similarly, in <u>John Crane, Inc. v. Jones</u>, 650 S.E.2d 851 (Va. 2007), the Supreme Court of Virginia ruled that maritime law

20

applied to an asbestos products liability action in which the
plaintiff's asbestos exposure occurred "while repairing and
constructing ships at the Newport News Shipyards." Id. at 854.
After finding the locality prong satisfied due to the locus of
plaintiff's exposure, the court disagreed with the defendant's
contention that neither prong of the Sisson/Grubart connection
test was met. See id. Like the Lambert court, the Jones court
concluded that the "inhalation of asbestos fibers while engaged
in the repair and construction of vessels on navigable waters had
the potential to disrupt maritime commerce" inasmuch as injury
"could potentially slow or frustrate the work being done on the
vessel." Id.

As to the second prong of the connection test, the
Jones court disagreed with the defendant's contention that the
"manufacture and sale of asbestos-containing products into the
stream of commerce is too far removed from traditional maritime
activities to create the necessary relationship." Id. at 854-55.
On the contrary, in fact, the court concluded that the
defendant's involvement in traditional maritime activity was
profound:

> [D]uring the time [the plaintiff] was exposed to
> asbestos-containing products manufactured by Crane, Crane
> marketed gaskets and packing material directly for the
> marine industry and advertised its products for 'marine
> engine and general ship use.' Crane also advertised its
> products in publications about maritime activity. This
> activity bore a substantial relationship to traditional
> maritime activities. The fact that Crane did not

21

directly undertake any activity aboard a marine vessel
does not obviate this connection.

Id. at 855.

Thus, although several courts have rejected the
application of maritime law in asbestos products liability suits,
more recent cases confirm that the earlier decisions so holding
are now in tension with the standard constructed in Sisson and
retooled in Grubart.

C.   Application

With this legal background in mind, the Court turns to
apply the Sisson/Grubart tests to the asbestos products liability
cases at issue, beginning with the locality test and then
addressing the two separate prongs of the maritime connection
test.  As outlined below, doing so in these cases results in
maritime law governing those claims involving plaintiffs who were
sea-based Navy workers so long as the allegedly defective product
was produced for use on a vessel.  Where the asbestos claims
asserted stem from predominantly land-based Navy work, however,
maritime law does not govern even if the allegedly defective
product was produced for use on a vessel.

1.   Locality Test

While each of the injured parties in these cases
sustained their asbestos-related injuries while working on or

22

around Navy ships, the locality test's focus on the place of the injury suggests that inquiry into the precise location in which the injuries were suffered is necessary. Navy workers like the injured parties in these cases, however, frequently split at least some portion of their time between ships on navigable waters and land. In addition, unlike other torts, asbestos-related disease has a long latency period and plaintiffs often rely on expert testimony that all non-trivial exposures to asbestos contribute to the disease process. See generally Harville, 731 F.2d at 782. Thus, in the case of asbestos-related disease arising from work on or around ships, the Court concludes that the locality test is satisfied as long as some portion of the asbestos exposure occurred on a vessel on navigable waters.[11] See id.

In this case, the evidence demonstrates that the injured parties in Conner, Prange, and Stone performed their Navy service at sea aboard Navy vessels. Consequently, the locality test is satisfied as to the plaintiffs in Conner, Prange, and Stone. In Willis, by contrast, the record is unclear as to

---

[11]    Consequently, the Court declines Plaintiffs' invitation to apply state law to some exposures and maritime law to others based on the locus of the exposure. Cf. Bartel ex rel. Estate of Rich v. A-C Prod. Liab. Trust, 461 F. Supp. 2d 600, 602, 604 (N.D. Ohio 2006) (applying maritime law to sea-based claims and state law to land-based claims where the plaintiff was exposed to asbestos in two separate jobs, one of which was entirely land-based and one of which was entirely sea-based).

precisely where the alleged exposure occurred.  Instead, the evidence adduced merely reflects that the injured party in <u>Willis</u> was a principally land-based shipyard worker who may or may not have suffered some of the exposure alleged aboard a vessel on navigable waters.

Because the locality test is not satisfied if the exposure alleged occurred exclusively on land, the Court may not exercise maritime jurisdiction unless the party invoking maritime jurisdiction demonstrates, by a preponderance of the evidence, that some exposure occurred on a vessel on navigable waters.  <u>See</u> <u>In re Bernstein</u>, 81 F. Supp. 2d 176, 177 (D. Mass. 1999).  The sparse evidence concerning the exposure suffered in <u>Willis</u> does not satisfy this burden.  Nevertheless, for the sake of completeness, the Court assumes <u>arguendo</u> that some of the exposure in <u>Willis</u> occurred on navigable waters and turns to apply the maritime connection test to Plaintiffs' claims.

## 2.   <u>Connection Test</u>

### a.   <u>Potentially disruptive impact on maritime commerce</u>

The Court's first task under this test is to determine whether the asbestos exposure Plaintiffs allege had a potentially disruptive impact on maritime commerce when characterizing the

24

incidents generally.[12]  See Grubart, 513 U.S. at 534.  In these
cases, the incidents can be characterized as exposure to
allegedly defective products on or around Navy ships.  Viewed in
this light, the Court concludes that the incidents plainly had a
potentially disruptive impact on maritime commerce as to the
injured parties in Conner, Prange, and Stone.  All three, after
all, served aboard Navy vessels that routinely sailed and docked
on navigable waters.[13]  They were effectively sailors, whose job
was to maintain equipment that was integral to the functioning of
the ships on which they served.  See Tritt v. Atl. Richfield Co.,
709 F. Supp. 630, 632 (E.D. Pa. 1989).  Under such circumstances,

---

[12]    As set forth more specifically supra in note 1,
Plaintiffs allege they sustained asbestos-related injuries due to
defective turbines, pumps, purifiers, generators, boilers,
valves, gaskets, packing, and steam traps manufactured by the
defendants in these cases.

[13]    Plaintiffs, however, pointing to dicta from The Eagle,
75 U.S. 15 (1868), contend that maritime jurisdiction cannot
attach because the injuries were sustained on or around Navy
ships and the Navy is not engaged in maritime commerce.  See id.
at 23 ("[T]he vessels engaged in making the seizure, as prize of
war, which are ships of the navy, or privateers, are not employed
at the time, in the business of commerce and navigation.").  The
Court disagrees.  Indeed, as Sisson and Grubart make clear,
vessels need not be directly involved in maritime commerce at all
for maritime jurisdiction to apply so long as the incident at
issue has a potentially disruptive impact on maritime commerce.
In Sisson, the Court held that this standard was met where a fire
erupted on a noncommercial vessel that was docked in a marina
that contained no commercial vessels.  See Sisson, 497 U.S. at
360.  It is nearly self-evident that, depending on the
circumstances, incidents on Navy ships could also have a
potentially disruptive impact on ships engaged in maritime
commerce.

exposure to defective products could "potentially slow or frustrate the work being done on the vessel." Jones, 650 S.E.2d at 854.

Indeed, exposure to defective products creates unsafe working conditions that could cause labor shortages on the ships due to injuries sustained aboard. See Lambert, 70 F. Supp. 2d at 884. And a shortage of this nature "could be exacerbated by fear of exposure by crew members and potential crew members alike."[14] Id. Any such occurrence would disrupt the Navy's ability to protect other commercial ships at sea if called upon to do so.

Moreover, the allegedly defective products in these cases were often insulated with asbestos or incorporated with asbestos-containing component parts to prevent fires aboard ships. See Johns-Manville Corp. v. United States, 855 F.2d 1571, 1571 (Fed. Cir. 1988) ("Due to the heat resistant and fire retardant properties of asbestos it was used in insulating ships' boilers, steam pipes, pumps, and other equipment."); Tritt, 709 F. Supp. at 632. Fire, as the Supreme Court recognized in Sisson, is "one of the most significant hazards facing commercial

---

[14]     Indeed, even if the Court defined the activity more narrowly as exposure to asbestos-containing products on or around Navy ships, it would still conclude that such exposure had a potentially disruptive impact on maritime commerce as to the parties in Conner, Prange, and Stone. While asbestos-related diseases often have long latency periods, any workers with knowledge of the dangers of asbestos may have refused to work thereby causing labor shortages that could potentially disrupt maritime commerce.

vessels." Sisson, 497 U.S. at 362.  With fewer workers available
to work with equipment in which asbestos was used for heat
resistance, a fire could erupt and disrupt commercial vessels.
See id. at 363.

But while the potentially disruptive impact on maritime
commerce is clear with respect to the injured parties in Conner,
Prange and Stone due to their status as sea-based Navy workers,
the facts in Willis present a much different question.  Indeed,
unlike the other injured parties discussed in this memorandum,
Peavy was a predominantly land-based worker.  In such instances,
the Third Circuit has instructed that maritime jurisdiction is
inappropriate.  See Eagle-Picher, 846 F.2d at 896 ("[A] shipyard
worker's claim based on an asbestos-related injury does not bear
a sufficient connection to traditional maritime activity.").
And, as discussed earlier, several other courts of appeals have
reached the same conclusion.

Of course, as the defendants point out, the Third
Circuit and various other courts decided as much under the Kelly
framework that was rejected by the Supreme Court in Grubart.
Depending on this logic and reasoning that maritime jurisdiction
is appropriate in Willis under the current standard, the
defendants ask the Court to apply maritime law notwithstanding
Eagle-Picher and like cases.  The Court agrees with the
defendants that the Sisson/Grubart connection test more readily

permits maritime jurisdiction in asbestos products liability cases stemming from work on or near ships than <u>Kelly</u> would allow. Nevertheless, the Court concludes that state law governs claims arising from predominantly land-based Navy work because a predominantly land-based Navy worker's exposure to defective products on or near ships does not have a potentially disruptive impact on maritime commerce.

Indeed, by serving in a Navy shipyard, such workers are more removed from maritime commerce than their sea-based Navy counterparts. For example, the prospect of injuries to predominantly land-based workers is less likely to disrupt maritime commerce because such workers would not be at sea to defend commercial ships if necessary. In fact, some portion of the work performed by such workers is not even undertaken on navigable waters at all. It is, of course, evident that the unsafe working conditions caused by exposure to defective products could conceivably cause some of the same disruptions to maritime commerce described with respect to the sea-based Navy workers in <u>Conner</u>, <u>Prange</u>, and <u>Stone</u>. This is not sufficient for maritime jurisdiction to attach; the exposure must pose "more than a fanciful risk to commercial shipping," <u>Grubart</u>, 513 U.S. at 539, and here the potential impact on maritime commerce is simply too attenuated.

Thus, although the asbestos exposure alleged had a

28

potentially disruptive impact on maritime commerce with respect
to the injured parties in Conner, Prange, and Stone, the Court
concludes that the exposure to the injured party in Willis did
not have a potentially disruptive impact on maritime commerce.
Consequently, maritime jurisdiction does not apply to the claims
asserted in Willis.  To determine whether it does apply in
Conner, Prange, and Stone, the Court turns to examine whether the
activity giving rise to the incident demonstrates a substantial
relationship to traditional maritime activity.

### b.    Substantial relationship to traditional maritime activity

The Court's role in this regard is to assess whether
the "tortfeasor's activity . . . is so closely related to
activity traditionally subject to admiralty law that the reasons
for applying special admiralty rules would apply in the suit at
hand."  Grubart, 513 U.S. at 539-40.  Viewing the activity
generally as the Court must, see Sisson, 497 U.S. at 364, the
Court finds that the activity engaged in by the numerous
defendants in these cases was the manufacture of products for use
on vessels.

Indeed, unlike the asbestos manufacturers who were
defendants in many of the prior cases deciding whether maritime
jurisdiction applies to asbestos products liability claims, see
supra Part III.B.1, the products manufactured in these

29

cases—turbines, pumps, purifiers, generators, boilers, valves, gaskets, packing, and steam traps—were essential for the proper functioning of ships and made for that purpose. The Court therefore concludes that their allegedly defective production bears a substantial relationship to traditional maritime activity. _See_ _Jones_, 650 S.E.2d at 855 (holding the substantial relationship prong of the connection test was satisfied because the defendant's products were produced and advertised for the marine industry).

Consequently, the claims in _Conner_, _Prange_, and _Stone_ are within the Court's maritime jurisdiction and therefore subject to resolution under maritime law.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that maritime law governs the disputes in _Conner_, _Prange_ and _Stone_, but not the dispute in _Willis_. Consequently, the motions for summary judgment in _Conner_, _Prange_, and _Stone_ will be granted to the extent they seek application of maritime law and maritime law will be applied in resolving the other issues raised in the summary judgment motions. The motions for summary judgment in _Willis_ will be denied inasmuch as they ask the Court to apply maritime law and _Willis_ will therefore be resolved under applicable state law. An appropriate Order will follow.

30