UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (No. VI) | } } } } } } | MDL DOCKET NO. MDL 875 |
| THIS DOCUMENT RELATES TO: | } | |
| LOIS JEAN CONNER, Individually and as Successor-in-Interest to ROBERT CONNER, deceased, et al., <br><br>v.<br><br>ALFA LAVAL, INC., et al. | } } } } } } } } | No. 09-67099 |
| JANE E. PRANGE, Individually and as Successor in interest to JAMES PRANGE, and MARGARET BOWKER,<br><br>   v.<br><br>ALFA LAVAL, INC., et al. | } } } } } } } } | No. 09-91848 |
| JAMES W. STONE and ELISE F. STONE<br><br>   v.<br><br>ALFA LAVAL, INC., et al. | } } } } } } | No. 09-93726 |

**CRANE CO.'S MEMORANDUM OF LAW ON
AN EQUIPMENT MANUFACTURER'S DUTY UNDER MARITIME LAW**

  Crane Co. respectfully submits the following memorandum of law regarding an equipment manufacturer's tort duty under maritime law.

**INTRODUCTION**

  The "bare-metal defense" is a recognition that cases like the ones *sub judice* present a threshold question of duty that the court must resolve. That question is whether the manufacturer of metal equipment can be held liable in a products liability claim for injuries allegedly caused

PI-3277705 v4

by asbestos-containing products that it did not manufacture or supply, but that were used with its equipment post-sale by the equipment's purchaser.  In other words, the "bare-metal defense" is not really a "defense" at all; it is an acknowledgement of the plaintiff's burden to show that the defendant manufactured or supplied the product that caused the harm.  In response to the Court's specific questions, in the maritime context, the "bare-metal defense" applies regardless of the alleged defect – manufacturing, design or inadequate warning.  Moreover, there is no difference whether the case involves asbestos-containing component parts or replacement parts.  Before the court can begin to analyze any of these claims, focusing on any of these products, the plaintiff must first establish that the defendant before the court placed into the stream of commerce the alleged harm-causing product at issue.  The test employed to make this threshold determination is whether the defendant manufactured the product or played a role in its supply and distribution chain, such that it gained direct financial benefits from its sale.

There is no question that maritime law embraces this concept when evaluating manufacturing defect, design defect, and inadequate warning claims.  Indeed, that is exactly the holding of *Lindstrom v. A-C Prods. Liab. Trust*, 424 F.3d 488 (6th Cir. 2005) and it was a holding that this Court adopted and applied in *Sweeney v. Saberhagen Holdings, et al.*, No. 09-64399, *Delatte v. A.W. Chesterton Co., et al.*, No. 09-69578,  and *Ferguson v. Lorillard Tobacco Co., Inc.*, No. 09-91161.[1]  *See Delatte* Order, p. 5 ("Under maritime law, a defendant is only legally responsible for component parts which it manufactured or distributed. . . . [A] defendant is not responsible for injuries caused by component parts which it neither manufactured nor

---

[1] Crane Co. refers the Court to the Report & Recommendation of Magistrate Judge Strawbridge in the *Sweeney* matter (docket entry 49 in *Sweeney*, the "*Sweeney* R&R") and the Order of the Court adopting the *Sweeney* R&R (docket entry 53), as well as to the Order of the Court in *Delatte*, docket entry 241 (the "*Delatte* Order") and the Order in *Ferguson*, docket entry 235 (the "*Ferguson* Order").

distributed."); *Ferguson* Order, p. 6 ("Under maritime law, Defendant is not liable for asbestos which was later incorporated into its products.").

*Lindstrom*, *Sweeney*, *Delatte*, and *Ferguson* represent nothing more than case-specific applications of the stream-of-commerce test. In each of these cases, plaintiff failed to establish that the defendant(s) at issue manufactured or supplied the alleged harm-causing asbestos-containing products that were used with the defendant's equipment after the sale, and thus failed to satisfy the stream-of-commerce test.

The stream-of-commerce test applied in *Lindstrom*, *Sweeney*, *Delatte*, and *Ferguson* is the appropriate test to apply in all cases brought against equipment manufacturers and focusing on alleged exposures to asbestos-containing products used with or near the equipment. If the plaintiff establishes that the defendant supplied the asbestos-containing products with the equipment at the time of sale, then a duty may exist, although other elements or defenses may come into play and resolve the claim (e.g., lack of sufficient causation evidence, the government contractor defense, etc.). If, on the other hand, the plaintiff cannot establish that the defendant placed into the stream of commerce the asbestos-containing products to which plaintiff was exposed, then maritime law recognizes no liability, as this Court correctly held in *Delatte*, *Sweeney*, and *Ferguson*.

## ARGUMENT

I.  **Maritime Law Limits Its Products Liability Causes of Action to the Entities That Place the Harm-Causing Product Into the Stream of Commerce.**

   A.  **Maritime Decisions Adopt a Stream-of-Commerce Approach to Products Liability.**

"[T]he doctrine of strict liability in tort is a part of the general maritime law. . . ." *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631, 636 (8th Cir. 1972); *accord East River S.S. Corp. v. Transamerica DeLaval, Inc.*, 476 U.S. 858, 865 (1986). Since recognizing

the strict liability doctrine, a number of courts sitting in admiralty have been called upon to define exactly who may bear strict liability.  The conclusion reached by court after court applying maritime law is that, for good policy reasons, products liability claims lie only against the entities that placed the alleged harm-causing product into the stream of commerce.

Accordingly, maritime decisions recognize that strict liability claims may lie against both "manufacturers" and "retailers" of injury-causing products.  *See Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129, 1135 (9th Cir. 1977); *accord Daigle v. L&L Marine Trans. Co.*, 322 F.Supp.2d 717, 727 (E.D. La. 2004) (noting that maritime law holds "a seller as well as a manufacturer" liable for "harm caused by a defective product placed in the stream of commerce").  However, maritime decisions have declined to extend maritime products liability causes of action beyond those entities that initially placed the alleged harm-causing product into the stream of commerce.  *See, e.g., Dunn v. Southern Charters, Inc.*, 539 F.Supp. 661, 670 (E.D.N.Y. 1982) (recognizing that "only manufacturers and distributors may be held strictly liable in tort"); *Delta Marine, Inc. v. Whaley*, 813 F.Supp. 414, 418 (E.D.N.C. 1993) (noting that the duty to warn in a maritime strict liability action is limited to "manufacturers who place goods into the stream of commerce").

As both maritime and many non-maritime decisions recognize, there are well-established policy reasons for limiting products liability causes of action to those entities that placed the alleged harm-causing product into the stream of commerce.  First, "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market."  *East River*, 476 U.S. at 866.  The parties best able to minimize the risks presented by a product are the "manufacturer and others in the initial chain of distribution" of the injury-causing product, and not entities wholly removed from that chain of distribution.  *See Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 879

(1997). Second, it is appropriate to place the costs of injuries resulting from products on those that directly profit from the sale of the products so that they may take the costs of their actions into account. *See Pan-Alaska Fisheries*, 565 F.2d at 1135 (holding that those entities that play an "integral part" in the "overall producing and marketing enterprise" of defective products "should bear the cost of injuries resulting from defective products"); *Arceneaux v. Lykes Bros. S.S. Co., Inc.*, 890 S.W.2d 191, 196 (Tex. Ct. App. 1994) ("A very basic concept of products liability is that the economic consequences of product defects should be placed upon those best able to avoid such defects.").

The rule that products liability causes of action lie only against the entities that placed the alleged harm-causing product into the stream of commerce is consistent with the Second and Third Restatements of Tort, both of which maritime decisions view as persuasive authority. The Restatement (Second) of Torts, § 402A makes strictly liable those entities "who sell[] any product in a defective condition unreasonably dangerous to the user or consumer" when the product causes physical harm. *Id.*; *see also Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631, 636 (8th Cir. 1972) (applying the Second Restatement in a maritime products liability claim). However, the Restatement is clear that this liability may exist only if "the seller is engaged in the business of selling such a product" and the product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." *See id.*; *see also id.* at cmt. f (again noting that strict liability is limited to those in the "business of selling" the harm-causing product at issue).

The Restatement (Third) likewise provides that an entity is liable for its own products, not the products of another. *See* Restatement (Third) of Torts, Products Liability, § 5 (adopting the "component parts" doctrine, which limits the liability of a component part supplier to injuries caused by the components it actually supplies, not the components of others); *see also Taylor v.*

*Elliott Turbomachinery Co., Inc.*, 171 Cal.App.4th 564 (Cal. Ct. App. 2009) (relying on the Restatement (Third) to hold that Navy equipment manufacturers had no duty, under any products liability theory, with respect to asbestos-containing materials that they did not manufacture or supply, but which were used with their equipment post-sale).

Maritime law is also clear that the stream-of-commerce rule does not cease to apply simply because two products were used in conjunction with one another.  For instance, in *Regan v. Starcraft Marine, LLC*, No. 06-1257, 2010 WL 996424 (W.D.La. March 17, 2010), the court held that the manufacturer of a boat could not be held liable for defects in a propeller used with its boat, but manufactured and supplied entirely by other entities.  The *Regan* Court found that defendant boat manufacturer "did not manufacture, install, sell, or distribute the propeller that was involved in the accident," and it was the boat's purchaser, not the boat manufacturer, that decided what propeller to use.  *See id*. at *3.  For all of these reasons, the *Regan* Court held that under such circumstances, the duty to provide warnings relating to the subject propeller "properly lies with the manufacturer/distributor of the propeller, not [defendant boat manufacturer]." *Id*. at *3 n.4.  The same rule should apply in the cases here, cases based on injuries allegedly caused not by the equipment of defendants, but by asbestos-containing products manufactured and supplied entirely by others.

> **B.**    ***Lindstrom* Correctly Recognizes and Applies the Rule That a Defendant Is Liable Only for the Products It Manufactures and Supplies, Not the Asbestos-Containing Products of Other Entities.**

The admiralty decision most closely analogous to the cases at issue here, and to many cases pending before this Court, is *Lindstrom v. A-C Prods. Liab. Trust*, 424 F.3d 488, 495 (6th Cir. 2005).  That decision holds that, under maritime law, an equipment manufacturer "cannot be held responsible" merely because asbestos-containing materials were "attached or connected" to its equipment post-sale.  In so holding, the *Lindstrom* Court recognized and applied the same

- 6 -

basic stream-of-commerce approach to products liability that is reflected in numerous maritime decisions and well-reasoned, non-maritime authority from around the country.

The analysis in *Lindstrom* is straightforward – if the plaintiff cannot show exposure to asbestos-containing materials that defendant placed into the stream of commerce by either manufacturing or supplying them, the plaintiff has failed to establish a *prima facie* products liability claim:

> The information presented establishes that the only asbestos-containing products . . . to which Lindstrom was exposed in connection with any Coffin Turbo products were not manufactured by Coffin Turbo, but rather products from another company that were attached to a Coffin product. Coffin Turbo cannot be held responsible for the asbestos contained in another product.

*Id*. at 496; *see also Lindstrom v. AC Prods. Liab. Trust*, 264 F.Supp.2d 583, 595 (N.D. Ohio 2003), *aff'd*, 424 F.3d 488 (6th Cir. 2005) ("A manufacturer is responsible only for its own products and 'not for products that may be attached or connected' to the manufacturer's product. . . . Since the insulation on the pump exterior was not a Coffin product and was put on by the shipyard, Coffin cannot be held responsible for exposure to the exterior insulation.").

In addition to adopting this basic stream-of-commerce approach, the *Lindstrom* Court noted that the "component parts" doctrine (which is embodied in the Restatement (Third) of Torts, Products Liability, § 5) further supports the rule that one entity generally is not liable for the products of another. On this point, the *Lindstrom* Court cited favorably to the Fifth Circuit's decision in *Koonce v. Quaker Safety Prods. & Mfg. Co.*, 798 F.2d 700 (5th Cir. 1986). In that case, which arose under Texas law, the court held that if the manufacturer of a system component part "does not take part in the design or assembly of the final system or product, he is not liable for defects in the final product if the component part itself is not defective." *See id*. at 715. The *Lindstrom* Court was correct to recognize the applicability of this rule to cases like the ones before the Court now because in such cases, the alleged "defect" complained of is not a

defect in any valve or pump, but rather a defect in an entire Navy steam system – namely, that the Navy chose to use allegedly dangerous asbestos-containing products to insulate and seal its piping systems.  *See Taylor*, *supra*.

With respect to each of the defendants before it, the *Lindstrom* Court applied the stream-of-commerce approach and component parts analysis in the same basic manner.  First, it identified all of the asbestos-containing products that were allegedly used with the defendant's equipment.  Second, it carefully noted the source of those products.  *See, e.g., Lindstrom*, 424 F.3d at 496 ("Lindstrom testified that new Coffin pumps do not come with any insulation and that Coffin did not send insulation at the time it delivered the pumps.  Lindstrom stated that any insulation put on a Coffin pump was probably provided by the shipyard.").  Where the court found evidence that the defendant equipment manufacturer had supplied the asbestos-containing product, the court went on to consider the issue of causation, duty having been established.  *See id*. (recognizing that the Coffin pump company could bear liability for the original packing supplied with its equipment, and considering whether plaintiff's evidence of exposure to that product was sufficient to survive summary judgment on causation grounds).  Where, however, plaintiff's evidence failed to establish that the defendant had placed the asbestos-containing product into the stream of commerce, the court upheld summary judgment.

In *Stark v. Armstrong World Indus., Inc.*, 21 Fed.Appx. 371, 381 (6th Cir. 2001), the court rejected a similar maritime claim against two boiler manufacturers based on alleged exposures to asbestos-containing materials manufactured and supplied by third parties and used with the boilers after their installation aboard ship.  The *Stark* Court noted that to permit the alternative rule that plaintiff sought (which would have imposed liability on equipment manufacturers for all products "attached" to their equipment) would be to expand greatly the scope of maritime products liability since "[o]n a ship most things are connected to other things .

. . ." *Id*. *Stark* makes it clear that, consistent with the component parts doctrine, the mere fact that a piece of equipment is integrated into a shipboard steam system that uses asbestos-containing materials cannot establish liability on the part of the equipment manufacturer. *See id*. ("This form of guilt by association has no support in the law of products liability.").

Accordingly, both *Lindstrom* and *Stark* apply the rule that although "[s]trict liability is imposed on entities in the distribution chain that placed a product into the stream of commerce," it is not imposed on entities that played no role in placing the harm-causing product into the stream of commerce. *See* 72A C.J.S. *Products Liability* § 52. As explained above, maritime decisions considering the issue have uniformly embraced this rule for good policy reasons. As explained below, non-maritime decisions from courts across the country have held in a substantially similar manner.

> C.  **The Stream-of-Commerce Test Applies to All of Plaintiffs' Claims, Under Any Theory of Defect or Alleged Component Part.**
>
> 1.  **The Notion That an Entity Is Responsible Only for Products That It Manufactured or Sold Is a Fundamental Tenet of Products Liability Law, Regardless of the Theory of Defect in a Particular Case.**

The *Lindstrom* opinion dealt explicitly with "products liability claims of design and manufacturing defects." *See Lindstrom*, 424 F.3d at 491. However, the stream-of-commerce reasoning and rule of *Lindstrom* apply to all products liability claims, of all types, as the lower court opinion affirmed in that case specifically noted. *See Lindstrom v. AC Prods. Liab. Trust*, 264 F.Supp.2d 583, 592 (N.D. Ohio 2003) ("A product seller cannot be held liable under a products liability theory for something other than its own product."); *see also Bartel v. Foster Wheeler Co.*, Case Nos. 1:94-cv-12030, 1:00-cv-11806 at 14 (N.D. Ohio March 11, 2004) ("In the absence of any evidence either that (1) defendants . . . manufactured or supplied an asbestos-containing product to which [plaintiff] was exposed or (2) defendants' products were defectively

designed, the Court finds that defendants . . . are entitled to summary judgment in their favor as a matter of law.") (a copy of the *Bartel* decision was attached as Exhibit H to Crane Co.'s Motion for Summary Judgment (Document No. 199-8) in the *Stone* case).

As these decisions recognize, there is no basis for concluding that the stream-of-commerce principle does not govern all types of products liability claims. Whether a product suffers from a manufacturing defect, a design defect, or an inadequate warning, the appropriate test for liability remains, was the trial defendant in a position to minimize the product's risks and absorb the costs associated with those risks, i.e., did the trial defendant play a significant role in placing the alleged harm-causing product into the stream of commerce? *See Pan-Alaska Fisheries*, *supra*, 565 F.2d at 1135; *Guarascio. v. Drake Assocs.*, 582 F.Supp. 2d 459, 462 (S.D.N.Y. 2008) (finding under maritime law that in order to establish a *prima facie* case for design defect a plaintiff must first prove "that the defendant sold or manufactured the product"); *Delta Marine, supra,* 813 F.Supp. at 418 (recognizing that the duty to warn in a maritime strict liability action is limited to "manufacturers who place goods into the stream of commerce"); *see also Regan, supra*, 2010 WL 996424, at *4 (dismissing claims under maritime law for design defect, manufacturing defect, and failure to warn because defendant boat manufacturer did not place into the stream of commerce the allegedly defective boat propeller that was the subject of the claim). If not, strict liability does not apply. *See Dunn*, *supra*, 539 F.Supp. at 670.

Although the *Stark* Court observed, in *dicta*, that an equipment manufacturer could potentially bear liability for asbestos-containing replacement parts used with its equipment on a design defect theory, the court envisioned the potential for such liability arising <u>only</u> in cases in which "the defective attachments manufactured by others were part of the [equipment] design and were rendered unsafe due to that design." *Stark*, 21 Fed.Appx. at 381. Even if the Court were to accept the *dicta* in *Stark*, Plaintiffs' argument, in these cases and in others, is that

asbestos-containing materials were inherently dangerous regardless of their exact use or application. In other words, they were allegedly "unsafe" in and of themselves; they were not "rendered unsafe" by any equipment design. Moreover, Plaintiffs have produced no evidence, in these cases or in any other, that Crane Co. designed its valves specifically to utilize asbestos-containing gaskets or packing, as opposed to some other type of gasket or packing. Accordingly, the conditions that the *Stark* Court described in *dicta* as potentially supporting liability are simply absent from the records before the Court here.

> **2. Although a Manufacturer May Bear Liability for Dangerous Parts It Supplies, It Does Not Bear Liability for Dangerous Replacement Parts Supplied By Others.**

The cases *sub judice* generally involve two categories of asbestos-containing products. First, Plaintiffs seek to hold Defendants liable for external insulation and flange gaskets. These products were not supplied with Defendants' equipment at the time of sale. However, the Navy may have acquired these products from third parties and used them on Defendants' equipment following the incorporation of that equipment into shipboard piping systems.[2] Second, Plaintiffs seek to hold the Defendant manufacturers liable for the replacement internal gaskets and packing that were used to replace gaskets and packing supplied with the equipment at the time of sale to seal the internal workings of the equipment. With respect to both of these classes of products, the rule is the same, and it was stated by this Court as follows: "[A] defendant is only legally responsible for component parts which it" manufactured or supplied. *Sweeney* R&R, p. 10.

*Lindstrom* is in perfect accord, having applied the rule that a manufacturer is liable *only* for its own product in situations involving both later-added parts that were not originally

---

[2] Crane Co. refers the Court to *Merrill v. Leslie Controls, Inc.*, 179 Cal.App.4th 262, 269-70 (Cal. Ct. App. 2009), which contains a thorough explanation of the equipment and asbestos-containing products at issue in cases of this general variety.

supplied with the equipment at issue and replacement parts.  With respect to later-added parts, the *Lindstrom* Court found that although plaintiff alleged exposure to asbestos-containing insulation used on the exterior of Coffin Turbo brand pumps, "Coffin did not send insulation at the time it delivered the pumps."  *Id*. at 496.  Coffin could not be liable for the insulation made and sold by third parties because under controlling maritime law, it could not "be held responsible for the asbestos contained in another product."  *Id*.

On the issue of replacement parts, the *Lindstrom* Court noted that there was evidence before the court that valve manufacturer Henry Vogt manufactured valves that it supplied with "encapsulated asbestos packing."  *Id*. at 494.  However, the evidence further showed that based on the Navy's maintenance schedules, "it would have been impossible for [plaintiff] to have handled any original packing or gasket material attributable to Henry Vogt."  *Id*.  The Court reasoned that "this fact compel[ed] the conclusion that any asbestos that [plaintiff] may have been exposed to in connection with a Henry Vogt product would be attributable to some other manufacturer."  *Id*. at 495.  Accordingly, plaintiff's claims did not meet the stream-of-commerce test, and the *Lindstrom* Court held that the defendant equipment manufacturers before it bore no liability for either later-added parts or replacement parts.

The *Lindstrom* analysis is consistent with the analysis of other courts that have considered potential "replacement part" liability.  For instance, in *Baughman v. General Motors Corp.*, 780 F.2d 1131, 1133 (4th Cir. 1986), the Fourth Circuit declined to impose liability on an automobile manufacturer for injuries caused by a defective replacement wheel used with the automobile post-sale.  The *Baughman* Court held that in such circumstances, where "the defendant manufacturer did not incorporate the defective component part into its finished product and did not place the defective component into the stream of commerce, the rationale for imposing liability is no longer present."  *Id*. at 1132-33.  The court noted that a different holding

would not be desirable from a policy perspective because it "would require a manufacturer to test all possible replacement parts made by any manufacturer to determine their safety" and would thus impose "excessive" burdens on product manufacturers. *Id*. at 1133. The court concluded that the duty to answer for injuries caused by replacement parts must "properly fall upon the manufacturer of the replacement component part." *Id*.

The Supreme Court of Washington reached a similar conclusion in *Braaten v. Saberhagen Holdings*, 198 P.3d 493 (Wash. 2008) after carefully analyzing the same basic issue presented in the cases *sub judice*:

> The harm in this case is a result of exposure to asbestos. These manufacturers, who did not manufacture, sell, or otherwise distribute the replacement packing and gaskets containing asbestos to which Mr. Braaten was exposed, did not market the product causing the harm and could not treat the burden of accidental injury caused by asbestos in the replacement products as a cost of production against which liability insurance could be obtained. Thus, the policies that support imposition of strict liability are inapplicable in this case. . . .

*Id.* at 501. Accordingly, the rule elsewhere and under maritime law is, and should be, the same – although a manufacturer may be responsible for the components of its equipment that it actually supplies at the time of sale, a manufacturer's liability does not extend to replacement parts used with the equipment following its sale.

## II. In Adopting a Stream-of-Commerce Approach to Products Liability, Maritime Law Is in Accord With the National Majority View.

### A. Courts Adopting the Strict Liability Doctrine Have Carefully Limited the Scope of the Doctrine to the Entities That Placed the Harm-Causing Product Into the Stream of Commerce.

Maritime decisions are hardly alone in limiting products liability causes of action to the entities that supplied the harm-causing product. Indeed, many of the maritime decisions cited above, including *Lindstrom*, draw heavily from state law formulations of the strict liability doctrine. Those formulations are entirely consistent with the stream-of-commerce approach

embodied in maritime decisions. Case law from across the country recognizes that "it is essential in a products liability action against the alleged manufacturer or seller for the plaintiff to identify the defendant as either the manufacturer or seller of the product complained of. . . ." Annotation, *Products Liability: Necessity and Sufficiency of Identification of Defendant as Manufacturer or Seller of Product Alleged to Have Caused Injury*, 51 A.L.R. 3d 1344, § 3 (citing, in support of the quoted principle, the law of at least 25 different states).

Imposing liability in any tort case, of any kind, should "depend[] upon a showing by the plaintiff that his or her injuries were caused by the act of the defendant or by an instrumentality under the defendant's control." *See Sindell v. Abbott Labs.*, 607 P.2d 924, 928 (Cal. 1980). Courts entertaining products liability actions have given effect to this principle by insisting that the defendant before the court have played some significant role in placing the alleged harm-causing product into the stream of commerce. *See, e.g.*, *Daly v. General Motors Corp.*, 575 P.2d 1162, 1170 (Cal. 1978) (noting that the "basis" for imposing strict liability on an entity is that it "marketed or distributed a defective product"); *Bostick v. Flex Equipment Co., Inc.*, 147 Cal.App.4th 80, 88 (Cal. Ct. App. 2007) ("The doctrine of strict products liability imposes strict liability in tort on all of the participants in the chain of distribution of a defective product.").

There are well-defined policy reasons for this limitation on products liability:

> [T]he loss caused by unsafe products should be borne by those who create the risk of harm by participating in the manufacture, marketing and distribution of unsafe products; who derive economic benefit from placing them in the stream of commerce; and who are in a position to eliminate the unsafe character of the product and prevent the loss.

*Hebel v. Sherman Equip.*, 442 N.E.2d 199, 205 (Ill. 1982). Thus, where a defendant did not place into the stream of commerce the alleged injury-causing product, strict liability will not lie against that defendant as a matter of law.

In *Rastelli v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 222, 225-26 (N.Y. 1992), the New York Court of Appeals summarized the stream-of-commerce test that a court must apply to determine whether an entity may be held liable in a products liability action, and it is substantially similar to the analysis in *Lindstrom* – did the entity have control over the production of the harm-causing product, have a role in placing it into the stream of commerce, or derive financial benefit from its sale? *See id*. If the answers to these questions are negative, the entity cannot bear liability as a matter of law. *Accord Bay Summit Community Ass'n v. Shell Oil Co.*, 51 Cal.App.4th 762, 776 (Cal. Ct. App. 1996) (holding that under the stream-of-commerce test, an entity is liable for a defective product only if (1) the entity received a direct financial benefit from the sale of the product, (2) the entity's conduct was "a necessary factor in bringing the product to the initial consumer market," and (3) the entity had "control over, or a substantial ability to influence, the manufacturing or distribution process").

> **B.      Courts Applying *Lindstrom* Have Held It to Limit Liability to Those Entities That Place the Alleged Harmful Asbestos-Containing Product Into the Stream of Commerce.**

Notably, this Court is far from the first court to have relied on *Lindstrom* to resolve claims of the general type of those pending before the Court now. Numerous courts nationwide have relied on *Lindstrom* and the principle that it observes to hold that equipment manufacturers do not bear liability for the asbestos-containing products of others.

For instance, on December 11, 2008, in companion opinions, the Supreme Court of the State of Washington found that equipment manufacturers are not legally responsible for third-parties' insulation, gasket, and packing materials used with or near the equipment. *See Simonetta v. Viad Corp.*, 197 P.3d 127 (Wash. 2008); *Braaten v. Saberhagen Holdings*, 198 P.3d 493, 504 (Wash. 2008). While *Simonetta* focused upon external insulation and *Braaten* focused upon gaskets and packing, both opinions reached the same conclusion – an equipment

manufacturer is not liable for asbestos-containing materials manufactured and supplied by others, regardless of whether the manufacturer could "foresee" the asbestos-containing materials being used with its equipment. The Supreme Court of Washington based its decisions on exactly the same stream-of-commerce rule of products liability that controls in maritime law, and it found the *Lindstrom* decision "particularly instructive" in reaching this holding. *See Braaten*, 198 P.3d at 502. The *Braaten* Court noted that *Lindstrom* demonstrates that it "does not comport with principles of strict liability to impose on manufacturers the responsibility and costs of becoming experts in other manufacturers' products." This is particularly so in a case like *Braaten*, in which the evidence showed that "more than 60 types of packing had been approved for naval use." *Id*. The evidence in the cases *sub judice* is substantially similar.

The California Court of Appeal's decision in *Taylor, supra,* of which the California Supreme Court denied review on June 10, 2009, is also instructive. In *Taylor*, the court held that whether the claim is grounded in strict liability or negligence, California law does not impose liability upon an equipment manufacturer for asbestos-containing materials (insulation, gaskets, or packing) that it did not manufacture or sell. *Id*., 171 Cal.App.4th at 592-96. In *Taylor*, the court focused upon the principles that (1) California courts apply product liability theories only to entities that are in the chain of distribution of the allegedly harmful product, and (2) a manufacturer can be held liable only when its product causes or creates the risk of harm. *Id*. at 575. The *Taylor* Court based its analysis, in part, on the holding in *Lindstrom* that the marine equipment manufacturers involved in that case could not be held liable merely because the asbestos-containing products of others were "attached" or "connected" to the equipment post-sale. *See id*. at 592.

Just last year, the Pennsylvania Superior Court cited *Lindstrom* as embodying the "majority view nationwide" that "an equipment manufacturer can not be held liable for products

it neither manufactured nor supplied." *See Schaffner v. Aesys Techs., LLC*, Nos. 1901 EDA 2008, 1902 EDA 2008, 2010 WL 605275, at *5 (Pa. Super. Jan. 21, 2010) (non-precedential decision) (further describing that in *Lindstrom*, "the Court of Appeals affirmed the grant of summary judgment to an equipment manufacturer where the evidence showed that, at the time the plaintiff worked with its product, no original asbestos components remained, and the manufacturer neither manufactured [n]or supplied the replacement parts"). The *Schaffner* Court relied on *Lindstrom*, among other authorities, to hold that there is "no basis for holding" an equipment manufacturer liable for the asbestos-containing products of others "under a theory of strict liability or failure to warn." *Id*. at *6.

In 2009, the Superior Court of Maine relied on *Lindstrom* and the Restatement (Second) of Torts, § 402A to hold that the manufacturer of a metal boiler had no liability for asbestos-containing materials supplied by others and used with its boiler post-sale. *See Rumery v. Garlock Sealing Techs., Inc.*, No. 05-cv-599, 2009 WL 1747857 (Me. Super., Cumberland Cty. Apr. 24, 2009) ("Similarly, in this case, it was not the Defendant's product, but the dangers inherent in the asbestos-containing packing and gaskets, a product the Defendant did not manufacture or supply, that proximately caused the Plaintiff's alleged damages.").

In *Kolar v. Buffalo Pumps, Inc.*, 15 Pa. D. & C. 5th 38, 2010 WL 5312168 (C.P. Philadelphia 2010), the Court of Common Pleas of Philadelphia County, Pennsylvania entered summary judgment for a pump manufacturer in substantially similar circumstances. Once again, the court relied on the "persuasive authority" of *Lindstrom* in so doing:

> In *Lindstrom v. A-C Product Liability Trust*, the U.S. Court of Appeals for the Sixth Circuit similarly declined to hold a pump manufacturer liable for injury allegedly due to third-party replacement asbestos gaskets and packing.

*Kolar*, 15 Pa. D. & C. 5th at 48.

In addition to these appellate and trial court authorities that specifically adopt the rule stated in *Lindstrom* in connection with state law claims, a number of courts adjudicating maritime claims involving equipment manufacturers have, like this Court, applied *Lindstrom*. In 2007, the Circuit Court for the City of Richmond, Virginia recognized and adopted the maritime rule that one manufacturer is not liable for harms caused by the products of another. On May 18, 2007, the court in *Marion L. Bock v. Alfa Laval, Inc., et al.*, No. CL06005700-00 (Cir. Court of Richmond, Va. May 18, 2007)[3] received argument on and decided in a pre-trial conference the issue presented in these cases. In response to plaintiff's argument that an equipment maker should bear liability for not only its own equipment, but also any products attached to that equipment at a later time by third parties, the court held:

> I don't believe the manufacturer is responsible to tell people or warn people of other products that may be used in conjunction with its product. That's too broad of a statement . . . I don't think the valve manufacturers had a duty to warn with regard to anything other than its own products. To the extent it had gaskets or other asbestos-containing products that it provided, certainly it has a duty to warn there, but not beyond that.

Exhibit A, 75:1-11. The court reached this holding on the basis of the *Lindstrom* decision, *see id. at* 74:8-24, and also on the basis of sound policy considerations. The court correctly pointed out that to hold an equipment manufacturer liable for products it did not make or supply simply because the use of those products with its equipment was allegedly "foreseeable" would be to hold Goodyear Tire liable each time a defective car jack gives way and causes injury. *See id. at*, 71:3-18. As the court noted, this is "too broad" a statement of American tort law.

The Superior Court of Delaware reached a similar conclusion less than six months ago in another case involving maritime law. In *In re Asbestos Litig. (Wesley)*, No. 09C-08-258 ASB, 2011 WL 2462569 (Del. Sup. Ct. June 7, 2011), plaintiff argued that Crane Co. could bear

---

[3] An excerpt of the transcript of the relevant pre-trial conference is attached as Exhibit A.

- 18 -

liability under maritime law for asbestos-containing products used with its valves post-sale, whether or not it actually manufactured or supplied those products. The court, relying on *Lindstrom* and *Stark*, rejected this argument, holding that maritime law does not recognize liability for an equipment manufacturer for the asbestos-containing materials of another, even if the use of those materials with its equipment was foreseeable. *See id*. at *3.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, Crane Co. requests that the Court grant it summary judgment to the extent Plaintiffs have failed to establish exposure to an asbestos-containing product manufactured or supplied by Crane Co.

Dated:  November 28, 2011         Respectfully submitted,

**K&L GATES LLP**

/s/ Michael J. Zukowski_____
Michael J. Zukowski (Pa. I.D. 84136)
Syed D. Ali (Pa. I.D. 206719)

K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Attorneys for Defendant Crane Co.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served on Plaintiffs' counsel and all counsel of record on November 28, 2011 and is available for viewing and downloading from the Court's ECF system.

/s/ Michael J. Zukowski
Attorney for Defendant Crane Co.
